IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| FABIAN MALDONADO PINEDO,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, and JON MARTINSON, JR.,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br>DENYING WESTFALL PETITION<br><br>Case No. 2:14-cv-723-TC |

This case arises out of an injury that Plaintiff Fabian Maldonado Pinedo sustained in July 2013 when he was an immigration detainee awaiting deportation by the United States Immigration and Customs Enforcement agency (ICE). According to Mr. Maldonado, when he was being transferred from one cell to another at the holding facility—during which he was fully restrained by leg shackles, a belly chain and handcuffs—Immigration Enforcement Agent (IEA) and Defendant Jon Martinson, Jr., threw him headfirst to the concrete floor to punish him for questioning Agent Martinson's authority. Mr. Maldonado brings a tort claim of assault and battery and a civil rights claim of excessive force.

Agent Martinson has filed a petition under the Westfall Act (his Westfall Petition)[1] in which he seeks certification that the United States, as his employer at the time, must substitute

---

[1] ECF No. 71.

1

itself for him and defend against Mr. Maldonado's tort claim of assault and battery.[2] The Government opposes the petition. For the reasons set forth below, the court denies Agent Martinson's petition.

## **PROCEDURAL BACKGROUND AND LEGAL FRAMEWORK**

When Mr. Maldonado filed his assault and battery claim against Agent Martinson, he also named the United States as a defendant under the Federal Tort Claims Act (FTCA).[3] He did this because when a federal employee is accused of committing a tort while acting within the scope of his employment, the United States may substitute itself for the federal employee and defend against the claim. 28 U.S.C. § 2679(d)(1).[4]

Substitution is not automatic. Under the Westfall Act, the U.S. Attorney General must first certify that the employee was acting within the scope of his employment when he allegedly committed the tort.

> <u>Upon certification</u> by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States … and <u>the United States shall be substituted as the party defendant</u>.

Id. (emphasis added).

The employee sets the substitution process in motion by filing a request for certification with his employer. 28 U.S.C. § 2675(a). In December 2016, Agent Martinson did that, but the United States denied his request because it determined he was not acting within the scope of his employment when he took Mr. Maldonado down to the ground. After the Government's denial,

---

[2] His Westfall Petition does not concern Mr. Maldonado's excessive force claim.
[3] The FTCA is located in the United States code at 28 U.S.C. §§ 1346(b), 2671–2680.
[4] <u>See also</u> 28 U.S.C. § 1346(b)(1) (providing that the United States may be liable "for money damages … for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment").

2

Agent Martinson filed a Westfall Petition with this court seeking certification, under Section 2679(d)(3) of the Westfall Act, that he was indeed acting within the scope of his employment.

The parties, whose briefs treated Agent Martinson's Westfall Petition like a summary judgment motion, argued their positions at the court's April 2018 hearing. The United States relied heavily on the surveillance video of the incident and the declaration of its expert witness. At the close of the hearing, the court found that the video did not definitively show what occurred on that day and that genuinely disputed material facts could only be resolved after an evidentiary hearing. Such a hearing would allow the parties to develop a more complete record and allow the court to evaluate witness credibility.[5] (See Apr. 25, 2018 Minute Entry, ECF No. 85.)

To that end, the court held a two-day evidentiary hearing in July 2018. The parties presented testimony of lay witnesses, including Mr. Maldonado and Agent Martinson, and testimony of competing expert witnesses. Other evidence included the surveillance camera footage of the incident (Gov't Exs. A & B), photos of the detention center (Gov't Ex. D), a copy of ICE's Use of Force Policy (Gov't Ex. H), and a summary of an ICE defensive tactics course titled "Arm Bar Takedown, Grounded Positions" (Martinson Ex. 12).

Now, based on an evaluation of the record and witness credibility, the court finds, for the reasons set forth below, that Agent Martinson has not met his burden to establish that he was acting within the scope of his employment.

---

[5] "Under the Westfall Act, a court must identify and resolve any disputed issues of fact regarding the employee's scope of employment. If there are disputed issues of fact, the district court should hold such hearings as appropriate (including an evidentiary hearing if necessary), and make the findings necessary to decide the Westfall certification question." Fowler v. United States, 647 F.3d 1232, 1241 (10th Cir. 2011) (internal quotation marks and citation omitted).

# FINDINGS OF FACT[6]

**The Incident**

On July 3, 2013, Mr. Maldonado was being held by ICE at its Decker Lake detention facility awaiting transport to the local county jail later that day. He was in a holding cell (Cell 5) with eight other men.

Agent Martinson was on duty, acting as the team lead. He had been an IEA for sixteen months, all of which were spent at the Decker Lake facility. Before that, he received four months of training.

After the detainees had been processed, Agent Martinson went to the holding cell to do a routine head count before transporting them to the jail. He saw Mr. Maldonado standing next to the door and asked a control room officer to electronically unlock the door.

Then Agent Martinson, who was not armed, opened the cell door and told Mr. Maldonado to sit down. According to Agent Martinson, Mr. Maldonado immediately took a "bladed stance" and stared at him (he "looked me up and down"). (Tr. 141:13-17, 191:7-11.) When Mr. Maldonado did not say anything, Agent Martinson repeated his command in Spanish.

Mr. Maldonado said, in English, something to the effect of "What if I don't want to sit down?" or "Why do I need to?" (Tr. 141:18-22, 298:18-299:3.) Agent Martinson responded that he was not asking, he was telling him to sit down, that Mr. Maldonado was a guest in his facility, and that Mr. Maldonado needed to obey his commands. But Mr. Maldonado did not sit down. Instead, he slowly circled the center bench with his hands behind his back, looking at

---

[6] The court bases its findings of fact in part on footage from the surveillance video recording, which is located at Government Exhibits A and B. Although that footage is important evidence, the quality of the recording is not ideal and the video has no sound. To the extent the video does not establish important facts, the court draws from the eyewitness testimony, expert witness testimony, and documents submitted during the hearing.

4

Agent Martinson for part of the time as he did so. Agent Martinson called this "mad dogging," which he viewed as a sign of disrespect. (Tr. 154:21.) Then, Agent Martinson testified, Mr. Maldonado said, as he was pacing, "Oh, I'm a guest in your house, am I," to which Agent Martinson replied "yes." (Tr. 142:2-16.) Mr. Maldonado admits that he failed to comply with the order or command, paced around the cell, and did not sit down until after Agent Martinson had closed the cell door.

Agent Martinson characterized Mr. Maldonado's actions and statements as "red flags." Specifically, he pointed to the "bladed stance," Mr. Maldonado's response suggesting he would not follow the order, Mr. Maldonado's choice to pace rather than sit down, and the staring ("mad dogging"). (Tr. 142:20-25, 143:1-5, 154:21.)

Given these red flags, Agent Martinson decided to separate Mr. Maldonado from the group and place him in another cell (Cell 1). He said he was worried that "the other detainees were going to think that it was okay to defy or to not obey commands" and he did not want the situation to escalate to the point where he lost control. (Tr. 143:8-9.) He had been trained to separate a detainee who was "possible trouble." (Tr. 144:5.) He closed the cell door, retrieved latex gloves, and called for back-up.

He testified that he decided to fully-restrain Mr. Maldonado because his "main concern" was his "safety." (Tr. 146:16.) Full restraint means the detainee's legs are shackled with a chain, a belly chain is placed around his waist, and wrists are handcuffed and attached to the belly chain. Agent Martinson said he made that decision because Mr. Maldonado "displayed all of these defiant and noncompliant behaviors. I took his size into consideration. He was taller and appeared to be larger than I was. And I just wanted to take every precaution at that time that I could so that I could escort him safely from cell 5 to cell 1." (Tr. 146:16-21.)

5

Use of full restraints on a detainee who is not being transported from one facility to another was very uncommon. Mr. Steven Branch (Agent Martinson's expert witness), when asked about the use of full restraints within the building, replied, "I wouldn't say it's the norm. It's not standard procedure." (Tr. 54:4-5.)

Agent Martinson re-opened the door and ordered Mr. Maldonado out of the cell. Mr. Maldonado complied without hesitation or resistance. The backup agents had not yet arrived. He then ordered Mr. Maldonado to face the wall and kneel on the metal bench in front of Cell 5. Mr. Maldonado, who was not restrained, faced the wall and casually leaned against the window with his arms. At first Mr. Maldonado only placed one knee on the bench. According to Agent Martinson, Mr. Maldonado also gave him a "100-yard stare for several seconds before he decided to place his second knee on the bench." (Tr. 146:8-9.) That interaction is not visible on the video. Agent Martinson interpreted this as another red flag.

While Mr. Maldonado waited, unrestrained, Agent Martinson, who was alone with Mr. Maldonado, turned his back on Mr. Maldonado and went to a cabinet to retrieve leg restraints. Agent Martinson testified that that was a mistake and that it was "probably not" the "most prudent action." (Tr. 144:21-145:10.) Although Agent Martinson testified that he had "no excuse" for doing that, he nevertheless said that he "was new." (Tr. 147:17.)

After Agent Martinson shackled Mr. Maldonado's legs, he again turned his back and walked to the cabinet to retrieve a belly chain and handcuffs. He returned, and as he was putting arm restraints on Mr. Maldonado, three backup agents arrived. Agent Aubrey, one of the three who responded to the call for backup, testified that "it was curious that [Agent Martinson] had started without other officers, to me personally, at that time. I'd only been working for less than

two years — about two years maybe, and that's something I wouldn't have been comfortable with doing personally." (Tr. 100:11-15.)

At that point, Mr. Maldonado was shackled with leg irons, belly chain, and handcuffs attached to the belly chain. He could not raise his hands or arms above his mid-chest and his stride was limited.

Holding Mr. Maldonado's left arm in a "C-Hold" in the "come-along" position (Tr. 91:11, 149:14), Agent Martinson slowly escorted Mr. Maldonado toward Cell 1, which was approximately thirty to forty feet away. The backup agents followed close behind. Agent Coste, one of the backup officers, said he saw no reason to intervene because "[f]rom what I was observing, it looked like Mr. Martinson had control of the situation. We were just there more as a backup in case, you know, anything did go south." (Tr. 221:12-17.) They did not see anything "go south" and did not intervene during the escort.

During the walk to Cell 1, Agent Martinson noticed "Mr. Maldonado kind of tense and flex his arm, and his upper body kind of move away from me." (Tr. 149:23-25.) To him, that was a sign of noncompliance. Agent Martinson said "don't pull away from me." (Tr. 150:5-6.) He testified that "[a]fter that, we took several steps – several more steps, again, heading to cell 1, and, once again, I felt his arm tense, I felt his arm flex, and his upper body or his upper torso moved away from me again." (Tr. 150:10-13.) He told Mr. Maldonado a second time not to pull away or he would take him to the ground. According to Mr. Maldonado, Agent Martinson said "if you resist I'm going to take you to the ground and it will be very painful I promise you[.]" (Tr. 302:21-24.)

A second or two later, when they were about five feet from Cell 1, next to a metal bench, Agent Martinson "felt Mr. Maldonado's arm tense, flex, and, again, his upper torso start to

7

move," so he performed what he called "a takedown technique." (Tr. 151:1-3.) Mr. Maldonado, who was to Agent Martinson's right, was quickly spun 270 degrees to the left. Mr. Maldonado went head first into the concrete floor. The video shows Agent Martinson's right hand on the back of Mr. Maldonado's neck and head as Mr. Maldonado hit the ground.

Agent Martinson said he spun Mr. Maldonado to the left to avoid contact with the nearby wall and metal bench, testifying that had he "executed the takedown the way it's supposed to be done, [Mr. Maldonado] would have hit his head either directly on the bench or on the wall, which is why I redirected him to the open area …." (Tr. 151:10-14.) When asked why he took Mr. Maldonado down to the ground, he said, "For my safety." (Tr. 151:19.) When asked what he hoped to accomplish with the takedown, he said, "Gain compliance" and "control the individual." (Tr. 152:4-8.) Agent Martinson testified that he was "absolutely not" trying to hurt Mr. Maldonado. (Tr. 152:13, 196:7.)

Upon hitting the floor face first, Mr. Maldonado temporarily lost consciousness. The force knocked out some front teeth. And he suffered lacerations to his forehead and the bridge of his nose that required stitches.

**Expert Testimony**

During the hearing, the court received testimony from two expert witnesses. Mr. Steven Branch, who is a former Field Office Director for the ICE region including Utah, Nevada, Idaho, and Montana, provided an opinion supporting Agent Martinson's position. Although Mr. Branch had years of experience as a border patrol agent and detention officer, his most recent experience and expertise grew out his supervision of deportation and detention enforcement officers in a role that was more managerial. He was not certified to train agents in

defensive techniques (i.e., techniques for "dealing with subjects under your control as far as handcuffing, re-training, or takedown"). (Tr. 26:1-3.)

The United States relied on the testimony and opinions of Caleb Vitello, who has been with ICE since 2001. Currently the Deputy Assistant Director of fugitive operations with ICE, he has been an ICE instructor of defensive tactics, firearms and arrest techniques since 2006. Early in his career he was a detention officer performing the same job duties that Agent Martinson performs. Mr. Vitello was the primary use-of-force instructor at the ICE training facility for about five years. His areas of instruction included "compliant and noncompliant handcuffing which included throws, takedowns, and different ways to handcuff individuals who were noncompliant." (Tr. 241:13-18.) He currently consults on incidents that involve ICE's Use-of-Force policy.

The court finds that Mr. Branch's ultimate opinion (that the takedown was appropriate and that Agent Martinson did not significantly deviate from or abandon his duties) has little weight. His expertise and experience, while providing insight into an IEA's job duties at the Decker Lake facility and an IEA's use of force to carry out those duties, was peripheral to the use-of-force issue before the court. Mr. Vitello's testimony, on the other hand, was highly-relevant, based on extensive expertise, and provided on-point analysis of the situation.

**ICE's Use of Force Policy and Continuum**

Both experts testified about ICE's Use of Force Policy, which sets forth the "Use of Force Continuum." The continuum "is a model used to illustrate the levels of force an officer may need to use to gain control over a subject. The continuum is comprised of five (5) levels." (ICE Use of Force Policy (Gov't Ex. H) at 1.) Those levels are (1) Officer presence; (2) Verbal commands; (3) "Soft techniques" (for example, escorting the detainee in the come-along

position, as Agent Martinson did); (4) "Hard Techniques" (including take-downs); and (5) Deadly Force. (Id. at 1-3.) This core concept is taught to IEAs like Agent Martinson.

Agent Martinson's takedown of Mr. Maldonado was a hard technique. Agents are taught that use of hard techniques presents a "[g]reater possibility of injury to participants." (Id. at 2.) Mr. Vitello similarly noted that when an agent uses a hard technique, injury is likely. (Tr. 260:16-25.) And that assessment is based on a scenario where the individual is not restrained.

Because of that likelihood of injury, ICE does not teach use of a hard technique, such as a takedown, on a fully-restrained individual. The agents testified that they had never been trained to do so. Mr. Branch has never seen ICE officers trained to take down a fully-restrained individual. And Mr. Vitello has never seen, and certainly does not teach, a takedown of a fully-restrained individual, a situation that is essentially "unheard of." (Tr. 260:25). He adamantly stated that what Agent Martinson did "is nothing that we teach, it is nothing that we do, it is nothing that we would agree upon." (Tr. 262:6-11.)

Indeed, Mr. Vitello testified that the takedown techniques discussed during the hearing have no relevance to a situation where the person is in full restraints because they were designed to take a noncompliant individual to the ground so he can be restrained. (Tr. 245:9-11.) He also noted that it would be physically impossible to perform the takedowns discussed (for example, the "arm bar takedown" and the "elbow rollover") on someone fully shackled because that person's hands would be chained to his waist. (See Tr. 245:24-246:19, 252:2-11.)

Mr. Vitello hesitated to call the spin that Agent Martinson pulled on Mr. Maldonado a takedown technique. The reason for Mr. Vitello's hesitation is apparent from the video. Agent Martinson's actions during the escort and takedown of Mr. Maldonado bore no resemblance to the takedown techniques discussed by the parties during the hearing and in photos depicting the

"arm bar takedown" in course curriculum. What Agent Martinson did was "highly irregular." (Tr. 261:5.)

Agent Martinson focused on the fact that ICE did not expressly prohibit use of a hard technique on a fully-restrained individual. But that fact does not help him. Common sense (particularly the common sense of a trained officer) says that use of a takedown on a fully-restrained individual would never be appropriate or effective (as Mr. Vitello noted, the technique's purpose was to control an unrestrained individual so that he could be handcuffed). Failure to prohibit the obvious is not an endorsement of the tactic or evidence that a trained officer would consider the move used by Agent Martinson to be an allowed method to control a detainee.

**Assessment of Agent Martinson's Actions and Credibility**

According to Agent Martinson, he was trying to maintain control after he saw red flags. When he met with resistance, he performed the takedown to get Mr. Maldonado to comply. He said he was "absolutely" not trying to hurt Mr. Maldonado. But, after hearing the testimony of the other agents, Mr. Vitello, and Mr. Maldonado, after reviewing the video, and applying common sense, the court finds that Agent Martinson was not credible.

Agent Martinson said he feared for his safety and the safety of the other agents. The only time Agent Martinson rationally should have felt fear was when he initially took Mr. Maldonado out of the holding cell, for at that point he was most vulnerable. He was unarmed and alone with an unrestrained detainee who had disobeyed a command.[7] Yet that is the very moment he turned

---

[7] During the hearing, Mr. Vitello demonstrated how vulnerable an agent is when he is attempting to shackle a person. As he was placing restraints on a willing subject (another FBI agent in the courtroom), he said "I feel very vulnerable because I am going to have to be very much in this person's personal space." (Tr. 249:1–250:8.)

11

his back on Mr. Maldonado.[8]

After he put leg restraints on what can only be characterized as a compliant detainee,[9] he was still vulnerable. Mr. Maldonado's legs were restrained, but he could still walk and his arms and hands were completely free. And no backup agent was present. Yet, again, Agent Martinson turned his back on Mr. Maldonado to get the belly chain and handcuffs. It was not until he was applying the belly chain and handcuffs that the backup agents arrived.

When asked about this during the hearing, Agent Martinson testified that, in hindsight, he made a mistake. He said he was "new" to the job. But he had been on the job for sixteen months. He had been fully trained to do the very tasks leading up to the moment when he threw Mr. Maldonado to the floor. Moreover, Mr. Vitello stated that "[w]ith 16 months on the job … those kinds of things present themselves quite often." (Tr. 287:2-4.) And, as Mr. Vitello pointed out, "If you really felt in fear for your safety your body wouldn't let you turn your back to this person. It's one of those visceral things that's not okay." (Tr. 257:3-8.) One need not be trained to appreciate the risk Agent Martinson faced when he took Mr. Maldonado out of the cell and turned his back.

Agent Martinson contends that when Mr. Maldonado was fully restrained, he still posed a threat to Agent Martinson and the other agents. This makes no sense. After Mr. Maldonado was fully restrained and Agent Martinson was backed up by three agents, there was no realistic danger. "[A]ny of those red flags that may have existed while he was unrestrained are null and

---

[8] According to Mr. Vitello, "Traditionally speaking, if the subject is intending to do an officer harm, they do it when they have the greatest chance of success which is when you're alone with somebody or when you're one on one or when they are in your personal space." (Tr. 258:21-25.)
[9] The court bases that conclusion on two things. First, it is clear from the video that Mr. Maldonado stayed right where he was directed to stay and remained calm. Second, Mr. Vitello said that "to cuff somebody in this position [i.e., kneeling on the bench] requires complete compliance." (Tr. 258:14-15.)

void once he is restrained especially at that level." (Tr. 284:15-17.) At that point, the threat level was "minimal, if any." (Tr. 259:12.)

> [W]ith somebody who is[,] their – their feet are restricted, their hands are restricted, they're off balance and even if they did try to do anything, um, I mean the level of success would be minimal. And with backup there, you know, one of the reasons we use backup is to dissuade an incident. So if Mr. Maldonado didn't take an aggressive action while he was alone with Officer Martinson, he certainly is less likely if he is going to do it at all with three other officers who are immediately there to jump in and help.

(Tr. 259:12-21.)

Agent Martinson argued that in theory Mr. Maldonado could have, for example, head-butted, pushed, lunged, or spit at Agent Martinson or the other agents. (See Tr. 57:1-4, 282:25-283:9.) But this hypothetical danger is so minimal under the circumstances that it is difficult to believe anyone in that room was concerned with those possibilities.

In short, Agent Martinson unpersuasively attempts to explain his takedown by citing to safety concerns. In fact, the safety of Mr. Maldonado (whom Agent Martinson had a duty to protect) was at risk. He had no ability to break his fall because his hands were not free. When a person is fully-restrained, he is "completely at the mercy of the person throwing [him] to the ground." (Tr. 263:7-8.)

Agent Martinson further tries to justify the takedown by claiming that he met with resistance and so he needed to "gain compliance." But there was no convincing testimony that Mr. Maldonado resisted. Mr. Martinson was not credible, and the other agents either testified that they could not remember seeing resistance or gave ambivalent answers, none of which indicated resistance. The video does not reveal signs of resistance, although, given its quality, it does not show subtle movements. But even if there was resistance, it was minor. Mr. Vitello testified that such slight resistance did not, and never would, justify the takedown performed by Agent Martinson. (Tr. 260:16-25.)

13

**Conclusion**

The court finds that Agent Martinson did not feel threatened by Mr. Maldonado (even before the restraints were applied), that he met with little, if any, resistance from the time he pulled Mr. Maldonado from the cell until he took Mr. Maldonado down, and that he intended to harm Mr. Maldonado when he threw Mr. Maldonado head first to the concrete floor. Accordingly, the court agrees with the United States that Agent Martinson took down Mr. Maldonado based on a "personal desire to physically punish the detainee for disrespecting authority." (Gov't's Proposed Findings of Fact and Conclusions of Law at 13, ECF No. 102.)

## **CONCLUSIONS OF LAW**

Agent Martinson bears the burden of showing, by a preponderance of the evidence, that his actions fell within the scope of his employment and, accordingly, that the U.S. Attorney General erred when he denied Agent Martinson's certification request. Richman v. Straley, 48 F.3d 1139, 1145 (10th Cir. 1995); Williams v. United States, 71 F.3d 502, 505 (5th Cir. 1995); Green v. Hall, 8 F.3d 695, 698 (9th Cir. 1993); Schrob v. Catterson, 967 F.2d 929, 935 (3d Cir. 1992); Hamrick v. Franklin, 931 F.2d 1209, 1211 (7th Cir. 1991); S.J. & W. Ranch, Inc., 913 F.2d 1538, 1543 (11th Cir. 1990).

Under the Westfall Act, to determine whether Agent Martinson was acting within the scope of his employment, the court applies the "respondeat superior" law of Utah. Richman, 48 F.3d at 1145 ("For purposes of [the Westfall Act], 'scope of employment' is defined by the respondeat superior law of the state where the incident occurred."). The principal "scope of employment" cases in Utah are Birkner v. Salt Lake County, 771 P.2d 1053 (Utah 1989), and M.J. v. Wisan, 371 P.3d 21 (Utah 2016).

In Birkner, the Utah Supreme Court articulated three criteria that a party must meet to establish that the employee was acting within the scope of his employment: First, "an employee's conduct must be of the general kind the employee is employed to perform." Second, "the employee's conduct must occur within the hours of the employer's work and the ordinary spatial boundaries of the employment." And third, "the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest." 771 P.2d at 1056–57.

In 2016, the Utah Supreme Court in Wisan whittled that list to two—i.e., the first and third—by repudiating the second criterion of "spatial and time boundaries." It said those elements "are no longer essential hallmarks of an agency relationship." 371 P.3d at 31 (citing Restatement (Third) of Agency § 7.07 cmt. b (Am. Law Inst. 2006), and cases outside Utah).

Although the criteria are specific, "the Birkner test provides flexibility, enabling it to be applied in various factual situations." Clark v. Pangan, 998 P.2d 268, 273 (Utah 2000). As the Utah Supreme Court has noted, "each case concerning scope of employment is very complex and must be carefully analyzed in light of the facts present." Id. at 272.

1. **Was Agent Martinson's Conduct the Type of Conduct ICE Hired Him to Perform?**

Under this prong, the employee's conduct must be "generally directed toward the accomplishment of objectives within the scope of the employee's duties and authority, or reasonably incidental thereto." Birkner, 771 P.2d at 1057. On the other hand, if the employee is "wholly involved in a personal endeavor," the employer is not liable for his actions. Id.

An IEA is hired to process detainees and keep fellow agents and detainees safe while maintaining order at the facility. Agent Martinson contends he was performing those duties when he separated, restrained, escorted, and took down a non-compliant detainee.

That may be the case for his initial action to separate Mr. Maldonado from the other detainees. But Agent Martinson's takedown of Mr. Maldonado was unprovoked. He meant to harm Mr. Maldonado, not to gain compliance or to protect someone's safety. Physically harming a detainee as punishment is completely outside the bounds of ICE's interests and the duties an agent is hired to perform. Accordingly, the court holds that Agent Martinson abandoned his job duties when he threw Mr. Maldonado to the floor.

### 2. Was Agent Martinson Motivated in Part to Serve His Employer's Interest?

According to the Utah Supreme Court, an employee satisfies this element if his "purpose or intent, however misguided in its means, [was] to further the employer's business interests." Id. "If the employee acts 'from purely personal motives … in no way connected with the employer's interests' or if the conduct is 'unprovoked, highly unusual, and quite outrageous,' then the master is not liable." Id. (emphasis added) (quoting W. Keeton, Prosser & Keeton on the Law of Torts § 70, at 506 (5th ed. 1984)).

The parties dispute whether the court may find, regardless of personal motivation, that an act is outside the "scope of employment" if it was "unprovoked, highly unusual, and quite outrageous." According to the United States, the language should be read to create an alternative test for determining whether the employee was motivated at least in part to serve his employer's interests. "[I]f the conduct was 'unprovoked, highly unusual, and quite outrageous' the master is not liable, regardless of the employee's motivation." (Gov't Proposed FOF & COL at 15.) Agent Martinson, on the other hand, characterizes the language as "a possible method of showing that the conduct was not motivated even in part to satisfy the interests of the employer" or an "indication as to the motivation behind the employee's conduct (i.e., purely personal vs. the interests of the employer)." (Martinson's Proposed FOF & COL at 23 (emphasis in original),

16

ECF No. 101.) The court need not resolve the dispute because under either construction, Agent Martinson's conduct, which the court finds to be "unprovoked, highly unusual, and quite outrageous," points to an act that was motivated purely by a desire to punish Mr. Maldonado.

Agent Martinson characterizes the Government's evidence (particularly the testimony of Mr. Vitello) as nothing more than a disagreement about how he should have performed his job. To him, even if he strayed in some fashion from his training or from standard procedures and policy, he was still motivated at least in part to serve his employer's purpose because he was attempting to maintain order and control a non-compliant detainee. The evidence shows otherwise, as was compellingly articulated by Mr. Vitello at the hearing.

First, Mr. Vitello said it was "highly unusual to take down a subject in full restraints in any circumstance much less so in a situation like this where you have back up immediately available." (Tr. 261:21-24.) Then, he noted, just a few feet from Cell 1, despite being in complete control of the situation (as the video shows and Agent Coste testified to), Agent Martinson abandoned the end goal of getting Mr. Maldonado into the cell. Instead, "as a matter of principle," he threw Mr. Maldonado to the floor for disobeying him two times. (Tr. 262:3-4.) Adding to that is Mr. Vitello's observation that the "technique" used "is nothing that we teach, it is nothing that we do, it is nothing that we would agree upon." (Tr. 262:7-8.) Finally, it appeared to him, as it does to the court, that Agent Martinson's hand was on the back of Mr. Maldonado's neck.

> [M]ore importantly than that [observation], it is the end result. The injuries happened to the subject's head. … [T]hat is clearly what impacted the ground. And it looks to me, from right there on the video, that he is driving [Mr. Maldonado's] head into the ground which is not something that we teach.

(Tr. 262:19-263:1.)

Agent Martinson purposely punished Mr. Maldonado for questioning his authority. Right before he threw Mr. Maldonado to the floor, he said, "if you resist I'm going to take you to the ground and it will be very painful I promise you[.]" (Tr. 302:21-24.) He followed through on his threat, knowing from his training (and, frankly, common sense) that a fully-restrained individual is "completely at the mercy of the person throwing [him] to the ground[.] (Tr. 263:7-8.) His act was not a misguided attempt to further ICE's interests. It was unprovoked because there was no discernable resistance or danger. It was highly unusual (performing a hard technique on a completely shackled person was not taught, was not approved, and was "unheard of." (Tr. 260:25.) And, given Agent Martinson's position of power and authority over a very vulnerable detainee, was quite outrageous. The court holds that Mr. Martinson acted solely from personal motives.

**ORDER**

For the reasons set forth above, Defendant Jon Martinson Jr.'s Westfall Petition (ECF No. 71) is DENIED.

DATED this 4th day of December, 2018.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge